**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**Case No.: 05-CIV-23098-COOKE/BROWN**

ACE PRO SOUND AND
RECORDING, LLC,

     *Plaintiff,*

v .

MARTIN P. ALBERTSON (a/k/a
MARTY ALBERTSON), individually,
*et al.*

     *Defendants.*

_____/

## OMNIBUS ORDER ON MOTIONS TO DISMISS AND MOTION TO STRIKE

**THIS CAUSE** is before the Court upon the Defendants' Motions to Dismiss [**DEs 63, 65,**

**67, 69, 70, & 71**], which, taken together, aim to dismiss the entire case per the Defendants'

Omnibus Notice of Filing Motions to Dismiss All Claims Contained in the Amended Complaint,

and also, the Defendants' related Motion to Strike Damages from Counts 8, 10, and 25 [**DE 68**].

It makes sense, thus, for the Court adjudicate all said Motions by this single Order.

    **I.**    <u>**Background**</u>

        *A.*    ***The Parties and the Claims***

By its 91-page Amended Complaint [DE 56], the Plaintiff Ace Pro Sound and Recording,

L.L.C. (Ace Pro), maintains this suit, in part, individually and, in part, as a class action, raising

twenty-six different counts, each count alleged against one or more of the following nine

defendants:[1] *Martin P. Albertson*, individually, *Guitar Center, Inc.*, and the Supplier Defendants,

_____

[1] Italicized for the reader's ease

namely, *Yamaha Corporation of America*, *Korg U.S.A., Inc.*, *Electrovoice*, a division of Texlex Communications, Inc., *Tascam*, a division of Teac Corporation, *JBL Professional*, a division of Harman International, *St. Louis Music, Inc.*, and *Mackie Designs, Inc.*   The Plaintiff alleges the twenty-six Counts as follows:[2]

- Count 1 against Defendant Albertson for a pattern of extortion activity in violation of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et. seq.*, and the Hobbs Act, 18 U.S.C. § 1951.

- Count 2 against Defendant Albertson for a pattern of extortion activity in violation of the Florida Racketeer Influenced and Corrupt Organizations Act (Florida's RICO Act), FLA. STAT. § 772.104.[3]

- Count 3 against Defendant Albertson for unconscionable acts and unfair trade practices—that Defendant Albertson coerced and otherwise induced the Supplier Defendants to refrain from dealing with the Plaintiff—in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), FLA. STAT. § 501.201, *et seq*.

- Count 4 against Defendant Albertson, under Florida law, for tortious interference with a contractual relationship between Ace Pro and Yamaha.

- Count 5 against Defendant Albertson, under Florida law, for tortious interference with business relationships between Ace Pro and the Supplier Defendants.

- Count 6 against Defendant Guitar Center and the Supplier Defendants for unreasonably

---

[2] The Court has taken all the enumerated Counts from the Plaintiff's Amended Complaint.

[3] The Plaintiff cites federal statutes as the basis for this state-law-based claim.  The Court will treat it as a harmless pleading error and assume the correct citations.

2

and illegally restraining trade—that the Guitar Center coerced and otherwise induced the Supplier Defendants (1) to refrain from dealing with the Plaintiff, and (2) to give the Guitar Center preferential contractual terms—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

• Count 7 against Defendant Guitar Center and the Supplier Defendants for unreasonably and illegally restraining trade—that the Guitar Center coerced and otherwise induced the Supplier Defendants (1) to refrain from dealing with the Plaintiff, and (2) to give the Guitar Center preferential contractual terms—in violation of the Florida Antitrust Act of 1980, FLA. STAT. § 542.19.

• Count 8 against Defendant Guitar Center and the Supplier Defendants for unconscionable acts and unfair trade practices—that the Guitar Center coerced and otherwise induced the Supplier Defendants (1) to refrain from dealing with the Plaintiff, and (2) to give the Guitar Center preferential contractual terms—in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), FLA. STAT. § 501.201, *et seq*.

• Count 9 against Defendant Guitar Center and the Supplier Defendants, under Florida law, for civil conspiracy to commit the unlawful acts alleged in the Amended Complaint and in this recitation of the Counts.

• Count 10 against Defendant Yamaha, under Florida law, for breach of a contract to supply the Plaintiff with certain music-related products.

• Count 11 against Defendant Yamaha, under Florida law, based in the equitable principle of promissory estoppel for reneging on a promise to supply the Plaintiff with certain music-related products.

- Count 12 against Defendant Korg, under Florida law, based in the equitable principle of promissory estoppel for reneging on a promise to supply the Plaintiff with certain music-related products.

- Count 13 against Defendant Tascam, under Florida law, based in the equitable principle of promissory estoppel for reneging on a promise to supply the Plaintiff with certain music-related products.

- Count 14 against Defendant Mackie, under Florida law, based in the equitable principle of promissory estoppel for reneging on a promise to supply the Plaintiff with certain music-related products.

- Count 15 against Defendant Guitar Center, under Florida law, for tortious interference with a contractual relationship between Ace Pro and Yamaha.

- Count 16 against Defendant Guitar Center, under Florida law, for tortious interference with the business relationships between Ace Pro and the Supplier Defendants.

- Count 17 filed as a class action claim against Defendant Guitar Center and the Supplier Defendants for unreasonably and illegally restraining trade—that the Guitar Center coerced and otherwise induced the Supplier Defendants (1) to refrain from dealing with members of the Plaintiff Class, defined in the Amended Complaint as retailers of musical instruments and/or sound equipment and/or recording equipment of the types and brands carried by Guitar Center, and (2) to give the Guitar Center preferential contractual terms—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

- Count 18 filed as a class action claim against Defendant Guitar Center for attempting to monopolize the product market for retail sales of musical instruments and/or sound

4

equipment and/or recording equipment of the types and brands carried by Guitar Center, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

- Count 19 filed as a class action claims against Defendant Guitar Center for monopolizing the product market for retail sales of musical instruments and/or sound equipment and/or recording equipment of the types and brands carried by Guitar Center, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

- Count 20 filed as a class action claim against Defendant Guitar Center and the Supplier Defendants for conspiring to  monopolize the product market for retail sales of musical instruments and/or sound equipment and/or recording equipment of the types and brands carried by Guitar Center, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

- Count 21 filed as a class action claim against Defendant Guitar Center for attempting to monopolize the product market for retail sales of musical instruments and/or sound equipment and/or recording equipment of the types and brands carried by Guitar Center, in violation of the Florida Antitrust Act of 1980, FLA. STAT. § 542.19.

- Count 22 filed as a class action claims against Defendant Guitar Center for monopolizing the product market for retail sales of musical instruments and/or sound equipment and/or recording equipment of the types and brands carried by Guitar Center, in violation of the Florida Antitrust Act of 1980, FLA. STAT. § 542.19.

- Count 23 filed as a class action claim against Defendant Guitar Center and the Supplier Defendants for conspiring to  monopolize the product market for retail sales of musical instruments and/or sound equipment and/or recording equipment of the types and brands carried by Guitar Center,  in violation of the Florida Antitrust Act of 1980, FLA. STAT. §

542.19.

- Count 24 filed as a class action claim for price discrimination and predatory pricing, in violation of the Clayton Act § 2(a), as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a).

- Count 25 filed as a class action claim against Defendant Guitar Center and the Supplier Defendants for unconscionable acts and unfair trade practices—that the Guitar Center coerced and otherwise induced the Supplier Defendants (1) to refrain from dealing with the members of the Plaintiff Class as defined *supra*, and (2) to give the Guitar Center preferential contractual terms—in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201, *et seq*.

- Count 26 filed as a class action claim against Defendant Guitar Center and the Supplier Defendants, under Florida law, for civil conspiracy to commit the unlawful acts alleged in the Amended Complaint and this recitation of the Counts.

## B.    *The Plaintiff's Factual Allegations* [4]

The Plaintiff alleges that Defendant Guitar Center is the world's largest musical instrument retailer and the nation's leading retailer of amplifiers and live sound and recording equipment, with 136 retail stores nationwide and plans to add 100 new stores.[5]  The Plaintiff goes on to state that Defendant Guitar Center intends to "monopolize or further monopolize the retail market for musical instruments and/or sound equipment and/or recording equipment in the

---

[4] This recitation of the factual allegations has been lifted and summarized straight from the Plaintiff's Amended Complaint.  Furthermore, in considering the motions to dismiss, the Court has taken all of the Plaintiff's factual allegations to be true.

[5] The Plaintiff also provides Defendant Guitar Center's sales figures for 2004.

United States, and force smaller retailers out of that market."

Plaintiff Ace Pro's story begins with the introduction of Frederick B. Rubin, the Plaintiff's managing member and director—a man who had had over thirty years of management experience in the retail musical instrument, and sound and recording equipment industry.  In these thirty years, Rubin of Ace Pro had dealt with, and developed and maintained amicable relationships with the above-identified Supplier Defendants.  So in 2001, Rubin founded Ace Pro; and in November of that year, Ace Pro leased a 3,700 square-foot building in the City of North Miami, Florida to operate a retail store selling musical instruments, and sound and recording equipment.  At the time of this lease, Defendant Guitar Center was running two retail outfits, ten to twenty miles away, selling generally the same goods the Plaintiff intended to sell.[6]   Enter the Supplier Defendants.

In January, 2002, Rubin, on the Plaintiff's behalf, attended the National Association of Music Merchants (NAMM) trade show at which all the above-identified Supplier Defendants were present.  Despite Rubin's past good relations with the Supplier Defendants, they all either refused to do business with him or ignored him completely due to economic coercion by Defendant Guitar Center—specifically, that Defendant Guitar Center used its leverage as a major retailer to threaten pulling its business from any Supplier Defendant who agreed to do business with the Plaintiff.  The Plaintiff's allegations apropos each particular Supplier Defendant in reference to Defendant Guitar Center follow below.

For several years prior to 2001, Rubin had had numerous discussions with Defendant

---

[6] Over some unspecified period of time, Rubin had invested a minimum of $240,000.00 in devising a business plan, preparing to open, and opening the new Ace Pro store in North Miami.

Yamaha's District Sales Manager, Mike Lamb, about opening up a new retail store to sell musical instruments, and sound and recording equipment.  In July, 2001, Lamb called Rubin to say that Defendant Yamaha would be interested in doing business with Lamb.  In October, 2001, Rubin contacted Lamb to explain that he needed a supply commitment from Defendant Yamaha to maintain an economically viable business.  On November 1, 2001, Defendant Yamaha disseminated a document purporting to make Ace Pro an authorized dealer of Yamaha products. The following day Lamb called Rubin to say that Yamaha headquarters had approved the Plaintiff as an authorized dealer and would begin selling products to the Plaintiff immediately. On November 14, 2001, Ace Pro representatives prepared an initial Yamaha order with Lamb's assistance.  Lamb commemorated the occasion by giving the Ace Pro founders shirts, a pen, and a pencil bearing the Yamaha logo, and congratulating the Ace Pro staff for the store being authorized to sell Yamaha products.

On November 30, 2001, however, Defendant Yamaha's National Sales Manager, Rick Young, informed Rubin that Yamaha would do no business with the Plaintiff whatsoever, including filling any pending orders.  On January 18, 2002, at a meeting between Ace Pro and Yamaha representatives, including Rubin of Ace Pro and Lamb and Young of Yamaha, Young reiterated that Yamaha would not do any business with Ace Pro.  The next day, Rubin learned that Defendant Albertson, then-CEO of Defendant Guitar Center, knew all about the meeting and its subject matter.

At the Summer, 2001 NAMM Show, Defendant Korg's President, Mike Covins, welcomed Rubin into Korg's display booth and assured him that Rubin's store would be authorized to carry Korg products.  Rubin, on behalf of the Plaintiff, relied on this representation,

and confirmed it in subsequent conversations with Korg's Florida representative, John Chase.  On and after November 28, 2001, however, Chase informed the Plaintiff's representatives that he was not allowed to do any business with the Plaintiff on behalf of Defendant Korg.

In November, 2001, the Plaintiff placed a $20,000.00 order with Defendant Electrovoice, whose Florida's representative, Mark Scola, responded by stating that he was seeking final approval for the order.  On December 7, 2001, Scola informed the Plaintiff that Defendant Electrovoice had rejected the order upon interference by Defendant Guitar Center.  Mark Scola elaborated that Defendant Guitar Center had gone to Electrovoice's highest authority and sabotaged Plaintiff Ace Pro's business relationship with Electrovoice.

In mid 2001, Rubin contacted Defendant Tascam's Florida representative, Chuck Prada requesting that Plaintiff Ace Pro, once open for business, be authorized to carry Tascam products.  Prada represented that the Plaintiff would be permitted to carry Tascam products, saying, "whatever you want, whenever."  Subsequently, the Rubin had numerous conversations with Defendant Tascam's representatives about Tascam products that piqued Plaintiff Ace Pro's interest.  When, however, in January, 2002, Rubin contacted Prada to discuss submission of an official Ace Pro order for Tascam products, Prada, without explanation, refused to accept any order from Plaintiff Ace Pro.

Throughout 2001, Rubin had had numerous dealership conversations with Defendant JBL's Florida representative, Larry Meyer, who had lead Rubin to believe that Plaintiff Ace Pro would be authorized to sell JBL products.  In January 2002, however, JBL informed Rubin that the Plaintiff would not be authorized to sell JBL products.

In November, 2001, Rubin met with Defendant St. Louis Music's representatives to

discuss Plaintiff Ace Pro's desired authorization to become a St. Louis dealer.  However, St. Louis abruptly discontinued negotiations with the Plaintiff, without explanation.

In October, 2001, Defendant Mackie's Florida sales representative, John Saviouno, assisted  Plaintiff Ace Pro's representative in preparing a written opening order and accepted said order for various Mackie products to be delivered to the Plaintiff's retail store in North Miami, FL.  Later, however, Mackie refused to deliver the products or do any business with the Plaintiff. Plaintiff alleges that Defendant Guitar center pressured Mackie to refuse the Plaintiff's business.

Finally, the Plaintiff alleges that in furtherance of a scheme to monopolize, Defendant Guitar Center used its market power to secure discriminatory and preferential benefits, promotional allowances, financial incentives, discounts, and many other favorable terms and benefits from the Supplier Defendants.

## II.    Discussion and Analysis

### A.    *Motion to Dismiss Standard*

"[W]hen considering a motion to dismiss, the court must accept all allegations of fact as true and should only dismiss when it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proven in support of his claim."  *Solis-Ramirez v. U.S. Dept. of Justice*, 758 F.2d 1426, 1429 (11th Cir. 1985) (*citing Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65-66 (1978)).  *See Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).  "[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. . .[t]o the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957).  However,

"conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. Bellsouth Telecommunications*, 372 F.3d 1250, 1262 (11th Cir. 2004).

### B.     RICO Claims

Defendant Albertson has moved to dismiss the federal and state RICO claims against him, Counts 1 and 2, stating that the Plaintiff's allegations fall short of a viable RICO claim.  The Plaintiff opposes.

The RICO Act—codified in 18 U.S.C. §§ 1962-68—imposes criminal and civil liability for, *inter alia*, specified federal offenses dubbed "racketeering activity," including the violations of the Hobbs Act, § 1951.  To sustain its § 1962(c) RICO civil damages claim, the plaintiff must allege:  (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to business or property.  *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1311 (11th Cir 2000); *see also Avgiran v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

The first two of the four above-identified RICO elements—(1) conduct, and (2) enterprise—are not at issue here, so the Court will proceed straight to the third element, "pattern."  The "pattern" element may  be fragmented into two prongs: (1) continuity of the wrongful activity, and (2) a relationship between the predicate acts that comprise the violation. *H.J. Inc. v. Northwestern Bell Tel. Co*., 492 U.S. 229, 239 (1989).  Relevant to the discussion at hand is the continuity prong—a temporal concept that could be either closed- or open-ended.  *Id*. at 241.

Closed-period continuity exists when a series of related predicate acts extend over a *substantial* period of time, as a matter of law, more than a few months.  *Id*. at 242.  The Eleventh

Circuit has found a six-month period of violative activity to *not* be sufficiently substantial enough to establish closed continuity. *Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm*., 953 F.2d 587, 593 (11th Cir. 1992).

Open-ended continuity presents itself in situations where there is a continuing threat of racketeering activity persisting into the future—for example, where the racketeering acts themselves include a specific threat of repetition extending indefinitely, or where the prohibited conduct is an entity's regular method of business. *H.J. Inc*., 429 U.S. at 242.

Also relevant to the discussion at hand is the "racketeering activity" element; Congress has identified certain conduct that may be recognized as racketeering activity. Extortion under the Hobbs Act, 18 U.S.C. § 1951, is a legally cognizable racketeering activity. To maintain a RICO action based on extortion, the plaintiff must allege that the defendant (1) obtained property, (2) from another, (3) with his consent, and (4) induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. *United States v. Adair*, 951 F.2d 316, 318 (11th Cir. 1992). The "obtaining property" element of extortion requires both a *deprivation and an acquisition* of property by the defendant. *Scheidler v. National Organization for Women*, 537 U.S. 393, 404 (2003).

Turning to the case at bar, the Court finds the Plaintiff's allegations deficient, as a matter of law, to sustain the RICO claims. The Plaintiff has failed to satisfy its pleading burden on both the elements of "pattern" and "racketeering activity."

Plaintiff Ace Pro fails to allege a "pattern" because the activity complained of is not continuous under either the closed- or open-ended theory of continuity. The Plaintiff cannot invoke closed-period continuity because the duration of the allegedly wrongful activity—less

12

than four months—is insufficient, as a matter of law, under that theory.  The Plaintiff, therefore, looks to open-ended continuity, arguing that Defendant Albertson's alleged economic coercion fits within this framework as being capable of repetition.  Specifically, Plaintiff Ace Pro argues that were it to try to enter the music business[7] again, the Defendant could repeat the alleged violations to keep Plaintiff out.[8]  The argument, however, misses the point; entertaining this line of reasoning would be tantamount to eviscerating RICO's pattern requirement because almost any conceivable act is capable of repetition.  So the question, here, must be whether the racketeering activity *inherently includes* the potential for repetition in perpetuity.  An example of this would be an organized crime or a gang "protection tax" forced upon neighborhood stores with the expectation that mafia members would collect the tax indefinitely at regular intervals.  Such is not the case here.  The Plaintiff does not allege this type of continuity, and, thus, cannot rely on an open-ended continuity theory to satisfy RICO's "pattern" element.

Having shown that the "pattern" element is unsupported by the Amended Complaint, the Court will now turn to element of "racketeering activity."  The RICO claims fail, additionally, on this element, because the Plaintiff—who looks to establish racketeering activity by claiming that the Defendant committed extortion under Hobbs—cannot fit its roundabout theory of extortion into the square opening carved out by the Hobbs Act, which requires the Plaintiff to allege that Defendant Albertson (1) obtained property, (2) from another, (3) with his consent, and (4) induced by wrongful use of actual or threatened force, violence, or fear, or under color of official

---

[7] Music business meaning the a retail outfit like the Guitar Center.

[8] The Plaintiff does not claim that the alleged violations are the Defendant's normal method of doing business.

right. *See supra* p. 12.

The Court must begin by examining exactly what property the Plaintiff claims that Defendant Albertson obtained or acquired.  The Plaintiff, however, provides little guidance as to the "property" in question, so the Court will examine the two reasonable scenarios.  One possible form of property that Defendant Albertson allegedly restrained was *the Supplier Defendants' the ability to sell freely to the Plaintiff*, or the profits derived therefrom.  If this is, in fact, a cognizable form of property under the Hobbs Act—which issue the Court need not take any position on at this point—the Court still fails to see how Defendant Albertson *obtained or acquired* that property.  Said Defendant never sought to nor did sell anything to the Plaintiff.  And without the element of acquisition of the property in question, a Hobbs claim must fail, as it does here.

Alternatively, the property the Plaintiff could be referring to may be *its own potential profits* derived from *its own ability to sell to the public*—specifically, that Defendant Albertson, by economic coercion, acquired the retail sales profits that would have gone to Ace Pro had the Defendant not committed the alleged violations.  Leaving aside all the assumptions that need be true for this theory to work, it fails simply on the "consent" element required by the Hobbs Act.  In other words, the Plaintiff never consented to relinquishing this alleged and attenuated property right to the Defendant.  This line of reasoning, therefore, fails as well.

So for all the reasons stated above, this Court cannot find that the Plaintiff has properly pleaded a cognizable RICO claim.

C.      *Claims of Tortious Interference with Contractual  and Business Relationship*

To state a claim for tortious interference with a contractual relationship under Florida law, a plaintiff must allege: (1) the existence of an enforceable contract, (2) the defendant's knowledge of that contract, (3) an intentional and unjustified interference by the defendant with the plaintiff's rights under the contract, and (4) resulting damages." *Mariscotti v. Merco Group At Akoya, Inc*., 917 So, 2d 890, 892 (Fla. 3d DCA 2005).

To state a claim for tortious interference with a business relationship under Florida law, a plaintiff must allege: "(1) the existence a business relationship, (2) the defendant's knowledge of that relationship, (3) an intentional and unjustified interference with the relationship, and (4) injury resulting from the breach of the relationship." *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999).

Under *Conley's* liberal pleading standard, the Plaintiff has satisfied its burden as to the tortious interference claims. *See supra* p. 10.

C.      *Antitrust Claims*[9]

To establish Sherman Act, § 1 restraint of trade violation, a plaintiff "must allege (1) an agreement to enter a conspiracy, (2) that is designed to achieve an unlawful objective." *Aquatherm Industries, Inc. v. Florida Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998). The Plaintiff has done this sufficiently to survive a motion to dismiss.  *See Conley*, 355 U.S. at 47-48.

As to the Plaintiff's Sherman Act, § 2 monopolization and attempted monopolization

---

[9] The discussion in this section applies equally to all state-law-based antitrust claims.

15

claims, the Defendants argue that the relevant product market definition the Plaintiff

provides—the product market for retail sales of musical instruments and/or sound equipment

and/or recording equipment of the types and brands carried by Guitar Center—is incognizable as

a matter of law.  The Defendants liken the Plaintiff's definition to the product market definition,

"name-branded deep discounted merchandise" found incognizable by the Southern District of

New York.  *E. & G. Gabriel v. Gabriel Bros., Inc.*, 1994 WL 369147 (S.D.N.Y. 1994).  This

Court finds the Defendants' parallelism tenuous, as the *E. & G. Gabriel* product market was far

more indefinite than the one in the case at bar.  Moreover, the Court highlights that the definition

of a relevant product market is a factual issue, and, thus, must be considerably lacking in

plausibility to be rejected as a matter of law.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d

1421, 1436 (9th Cir. 1995).  Therefore, without deciding upon adequacy of the Plaintiff's product

market definition at this juncture, the Court will allow the claims to go forward at this motion to

dismiss stage.

### D.   *Claims concerning the Civil Conspiracy, FDUTPA, Breach of Contract, and Promissory Estoppel*

In light of the discussion above, the allegations in the Amended Complaint, and the

liberal pleading standard mandated by *Conley*, the Plaintiff may move past this motion to dismiss

stage with its claims for civil conspiracy, violations of the FDUTPA, breach of contract, and

promissory estoppel.

However, as to Counts 8 and 25 (FDUTPA), the Court will not allow the Plaintiff to

assert a consequential-damages theory.  *See Eclipse Med., Inc. v. American Hydro-Surgical

Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999) ("FDUTPA offers two types of

remedies: equitable relief in the form of declaratory or injunctive relief pursuant to FLA. STAT.

501.211(1) or actual damages pursuant to FLA. STAT. 501.211(2).").  It is premature, however, at

this early juncture, for the Court or the Parties to understand or limit how the damages theories will be being parsed any more than what the Court has stated above.

Finally, at this point, the Plaintiff's consequential damages theory under Count 10 (Breach of Contract) will not be stricken.

In light of the foregoing, the Court hereby

**ORDER and ADJUDGES** as follows:

1.      Defendant Albertson's Motion to Dismiss Counts 1 and 2 [**DE 65**] is **GRANTED**, and said Counts are **DISMISSED**.

2.      All remaining Motions to Dismiss [**DEs 63, 67, 69, 70, 71**] are **DENIED**.

3.      The Defendant's Motion to Strike [**DE 68**] is **GRANTED** *in part*, and **DENIED** *in part without prejudice*, as per this Order.

**DONE and ORDERED** in Chambers, Miami, FL, this 30th day of March, 2007.


_____
MARCIA G. COOKE
United States District Judge




Copies furnished to:
*Magistrate Judge Stephen T. Brown*
*Counsel of Record*